SAMUEL, Judge.
The decedent herein, Oswald W. Viosca, died on October 10, 1965 leaving his two daughters, Lynn Viosca Brignac and Joan (Andree) Viosca Gamble, as his only heirs. He left a last will naming his brother Jules (Jules J. Viosca, Jr., hereinafter in this opinion referred to simply as Jules Viosca) testamentary executor. Jules Viosca qualified as executor and in due course filed inventories of the assets of the estate. Lynn Viosca Brignac then filed a rule- to show cause in the form of a motion to traverse the Orleans inventory. She alleged the decedent had purchased certain bonds having a face value of approximately $139,000; that those bonds were in the possession of Jules Viosca; and that the same should be inventoried as assets of the decedent’s estate. Jules Viosca and the notary who had taken the Orleans Parish inventory were ordered to show cause why the bonds should not be determined to be assets of the decedent and why they should not be included in the Orleans inventory of assets of the decedent’s estate.
After trial on the merits of the rule there was judgment recognizing the bonds as assets of the decedent and ordering that they be inventoried as such. Jules Viosca has appealed claiming, as he did in the trial court, that he is the owner of the bonds.
The bonds are twenty-seven $5,000 unregistered negotiable Louisiana Fiscal Authority Series D 3Y%% bonds due March 15, 1973 and bearing certificate numbers 1591-1617. They were purchased from E. F. Hutton & Company, Inc., a New Orleans security dealer, on September 21, 1964. The purchase price of $138,296.87 was paid by a National Bank of Commerce in New Orleans cashier’s check in that amount. The sole question before us is whether the bonds are the property of the succession of Oswald W. Viosca or the property of Jules Viosca.
Testifying on behalf of plaintiff in rule were the two daughters and heirs of the decedent, Mrs. Brignac and Mrs. Gamble; John P. Mitchell, a salesman for Hutton; and Walter D. Kingston, Jr., manager of Hutton’s bond department at the time of the purchase. Testifying on behalf of Jules Viosca, in addition to himself, were Miss Doris Claire Fleckinger, who had been his secretary for 22 years but who was not in his employ at the time of trial, and C. F. Andressen and Rodney J. Emmer, officers of the National Bank of Commerce. The record also contains documentary evidence.
Mrs. Brignac testified: Her father had often discussed his financial affairs with her and had expressed interest in municipal or tax-free bonds. Three or four mdnths prior to the purchase thereof, he mentioned the bonds here involved, telling her he was buying the bonds because, being very ill at the time and knowing he had only six months to live, insurance rates were much too high and he wanted to protect his children. After the purchase had been made he told her of the same in the presence of her maid and her mother-in-law. (We note that neither the maid nor the mother-in-law was called as a witness by plaintiff in rule.) He did not tell her where the bonds were nor did he lead her to believe they belonged to anyone else.
Mrs. Gamble testified she had worked for her father as secretary from 1961 to 1963 and from August 31, 1965 to just before the date of his death. He had discussed his financial affairs with her and particularly had discussed purchasing municipal bonds for tax purposes. He fre *513 quently referred to the purchase of the bonds here involved because he wanted to he sure she and her sister “ * * * would be provided for and without having to pay all of the inheritance taxes that the Government, you know, usually applies to an estate”. She was present on occasions when her father discussed purchasing bonds with Mitchell, whom she had been seeing socially, and at no time did he indicate he was purchasing the bonds in suit for anyone else. He never told her where the bonds were located. Her father and her uncle Jules had an arrangement between themselves under which Miss Fleckinger, her uncle’s secretary, prepared her father’s tax returns and acted as his bookkeeper. In return her father, a practicing attorney at law for many years, did all of her uncle’s legal work without charge. Just prior to his death the decedent had made arrangements with Mitchell to purchase about $30,000 of municipal bonds.
John P. Mitchell testified he had known the decedent since 1962. At that time he began seeing Mrs. Gamble socially and he had continued to see her to the time of trial. Oswald Viosca was interested in municipal bonds. The decedent phoned him relative to the purchase of the bonds in question, informing him of what bonds he wanted and where they were located (at another New Orleans brokerage firm). He inquired whether Mitchell could get the bonds and make a commission and received an affirmative answer. As Mitchell was concerned primarily with stocks he contacted Kingston in Hutton’s bond department and an account was opened in Oswald Viosca’s name. This witness was not present when the bonds were picked up; he had another appointment at the time and when he returned the transaction had been completed. He did see the decedent as the latter was leaving the Hutton building just after the purchase had been made and delivery taken. At that time Oswald Viosca did not have the bonds with him. At no time did the decedent ever indicate to this witness that the bonds were being purchased for anyone else. Shortly before his death the decedent had made arrangements with this witness to purchase municipal bonds in the amount of approximately $30,000 but the bonds were not received by Hutton until after his death and the transaction was not completed. Mitchell also testified he received a commission on the sale of the bonds involved herein and that' he did save the purchaser some money on the purchase price.
Walter D. Kingston, Jr., the manager of Hutton’s bond department, testified: The decedent, who had been referred to him by Mitchell approximately two months prior to the purchase in question, expressed an interest in purchasing bonds on several occasions and Kingston showed him several offerings. The negotiations culminated in the purchase of the bonds involved here. Several days before delivery of the bonds was made Jules Viosca came to Kingston’s office with a check for thé purpose of picking up the bonds. But he left abruptly without obtaining them. The witness did not remember why Jules Viosca had left and was under the impression, but was not certain, Hutton had the bonds at that time. On September 21, 1964 Oswald Viosca and a lady “evidently his secretary” came to Kingston’s office. The check, which the decedent had with him, was brought downstairs to the cashier and receipted for by her; the cashier also completed a delivery receipt. The bonds were counted and checked in the presence of Kingston, Oswald Viosca and the secretary. ' No comment was made to the effect that the bonds were being purchased for anyone else. However, on cross examination this witness admitted that the “negotiations” he referred to had been conducted only over the telephone; he had never met the decedent prior to September 21, 1964; and on that date he satisfied himself as to Oswald Viosca’s identity by checking the latter’s drivers license.
Miss Fleckinger testified: Jules Viosca was in the real estate business and she had *514 been his secretary for 22 years. He would invest money from the business as the same accumulated. She discussed with him the advisability of purchasing municipal bonds because of their tax-free status. Then she and Jules Viosca went to see Mr. Emmer, trust officer at the National Bank of Commerce, who recommended the particular State of Louisiana Fiscal Authority bonds involved here. The decedent knew about the contemplated purchase of the bonds and informed Jules Viosca he could save the latter some money if he would let the decedent handle the purchase through his daughter’s friend (Mitchell) at Hutton’s. The decedent obtained a quotation from Mitchell which was four hundred or six hundred dollars cheaper than Emmer had quoted. Jules Viosca obtained the money for the purchase by cashing in $140,000 of his homestead stock, most of which stock was redeemed on September 9, 1964. The homestead checks thus received were cashed and the money was placed in Jules Viosca’s bank box in the National Bank of Commerce. A few days later the money was transferred to her bank box in the same bank. Just before the sale was to be completed she and Jules Viosca took the money out of her box and went upstairs where they met Oswald Viosca in the lobby. The cashier’s check was 'then obtained in the presence of those three persons. She did not remember whose name was used as remitter or purchaser of the check but believes it was the decedent’s name because he told Jules Viosca that as he was the lawyer who was handling the matter his name should appear and Jules Viosca reluctantly agreed. The three persons then went to Hutton’s to pick up the bonds but they were not ready. She and the decedent went back to Hutton’s on the following Monday (September 21, 1964). Jules Vios-ca had given her the check and she turned the same over to the decedent at Hutton’s. Mr. Kingston took care of the transaction and the bonds were received in the waiting room. She checked over the bonds to make sure they were all there and took them with her placing them in her bank box after marking them “property of Jules J. Viosca, held for safekeeping only”. They were subsequently transferred to the bank box of Jules Viosca. She testified there was no question but that the bonds had been purchased for Jules Viosca and with his money and that the bonds belonged to him. On cross examination she admitted that after the succession had been opened and while there was a contest over whether or not Jules Viosca should be appointed executor, she had told two attorneys for the estate who were in Jules Viosca’s office at the time that she didn’t know anything about the bonds. She explained she had heard Jules Viosca tell them he didn’t know anything about the bonds and she simply gave them the same answer.
Jules Viosca testified: He purchased the bonds in September of 1964, obtaining the necessary funds by cashing some of his homestead stock. The homestead checks thus received were cashed at the National Bank of Commerce where he has accounts and several days thereafter he obtained that bank’s cashier’s check. He had become interested in obtaining municipal bonds at Miss Fleckinger’s suggestion and after discussing the matter with Rodney J. Emmer, trust officer at the National Bank of Commerce. The decedent knew about the proposed purchase as a result of having heard this witness and Miss Fleckinger discussing the same in the office. Oswald Viosca asked this witness to give the sale to his daughter’s friend (Mitchell) so that he could make a commission. It had been the intention of the witness to purchase the bonds through another securities dealer but following his brother’s suggestion they called Mitchell and discovered the bonds could be obtained through him at a saving of several hundred dollars. He purchased the cashier’s check given for the bonds with the cash he had obtained from his homestead stocks. With him at the time the check was purchased were the decedent and Miss Fleckinger. The three of them then went to Hutton’s. He had the check but *515 did not receive the bonds at that time because they were not ready. He kept the check in his office safe over the weekend. Because he had to go elsewhere at the time, he was not present when Miss Fleck-inger and the decedent walked to Hutton’s and picked up the bonds. The bonds were kept in Miss Fleckinger’s bank box for some time and then placed in his bank box. The decedent never had possession of the bonds or any interest therein.
In a deposition taken prior to trial before Max Zelden, attorney for plaintiff in rule, Jules Viosca had denied having any knowledge of the bonds here involved. When testifying during the trial he admitted he had lied when he so testified in the deposition and that he had had possession of the bonds at all times including the time he gave that testimony. He stated his reason for lying was that the questioner in the deposition, Mr. Zelden, was the attorney who had been consulted by Mrs. Jules Viosca for the purpose of obtaining a judicial separation and he wished to keep this information from Zelden for that reason.
Rodney J. Emmer, a trust officer of the National Bank of Commerce, testified that during the latter part of the summer of 1964 (he was unable to remember the time more specifically) Jules Viosca and Miss Fleckinger discussed with him the advisability and advantages of tax-exempt bonds. They went over a “Blue List”, a national publication listing issues available for purchase, and selected some State of Louisiana bonds in the neighborhood of $100,000. Jules Viosca borrowed the list and returned it the next day with the statement that they were going to purchase the bonds elsewhere. Oswald Viosca’s name was never mentioned during the conversation.
C. F. Andressen, a National Bank of Commerce official, testified that about a year and a half or two years prior to the date of trial (the trial was held on October 21, 1966) Jules Viosca, with Miss Fleckinger present, called upon him to approve various homestead checks in an amount in excess of $100,000 which Jules Viosca wished to cash. At his bank a transaction of such size must be approved by a bank official. He approved the checks and went with Viosca and Fleckinger to the teller’s cage to obtain the money. Miss Fleckinger counted the money. This witness identifed some of the various homestead checks which had been cashed after he had approved the same and those checks are in evidence.
There are some conflicts and contradictions in the testimony of .the witnesses. As-the trial was held more than two years after the occurrence of the events which were the subject of the testimony, it is understandable that some of the details were difficult to remember after that lapse of time. However, as the contradictions and conflicts to which, we refer are minor and relatively unimportant, an extended discussion of the same is unnecessary.
The following documentary evidence was offered and is included in the record before us:
(1) Various homestead checks (which were approved by Emmer when cashed on September 16, 1964) payable to Jules Viosca and various homestead ledger sheets of accounts in that name; withdrawals shown by the ledger sheets and the checks, all of which withdrawals and checks are dated September 8, 9 or 16, 1964, total $140,000. In addition there are cancelled checks of Jules Viosca, payable to those various homesteads, and transfers showing acquisition of the stock or opening of the accounts in his name prior to 1964.
(2) The record in the matter entitled “Mrs. Armand C. Scully vs Oswald W. Viosca, Her Husband”, #381 -636 of the docket of the Civil District Court for the Parish of Orleans, a suit for separation filed by the decedent’s wife on June 12, 1960. The suit was dismissed by joint motion of the litigants on March 20, 1961 *516 but the record does contain pleadings filed by the decedent in connection with alimony. In those pleadings, which are dated December 1 and 2, 1960, he states he has been seriously ill and is unable to pay the $500 per month alimony which he had been condemned to pay.
(3) “Succession of Mrs. Armand Scully, Wife of Oswald W. Viosca”, #402 751 of the docket of the Civil District Court for the Parish of Orleans, the succession of the decedent’s wife who died on June 29, 1962 as a result of an accident suffered while visiting her husband at the hospital in which he was confined. The stated value of Mrs. Viosca’s estate, including her share of all community property accumulated during 24 years of marriage to the decedent, was $13,319.69.
(4) The record in the matter entitled “Oswald W. Viosca, Lynn Viosca Brignac and Joan Viosca Gamble vs Touro Infirmary and Employees Mutual Liability Insurance Company of Wausau”, #405 087 of the docket of the Civil District Court for the Parish of Orleans, a suit for damages resulting from the accidental death of Mrs. Viosca, in which Oswald W. Viosca obtained a judgment on January 29, 1964 in the amount of $20,000 plus various medical expenses. The two children each recovered $7,500. The judgment was affirmed on appeal. Viosca v. Touro Infirmary, La.App., 170 So.2d 222.
(5) “Succession of Mrs. Emily Ehr-hardt, Widow of Jules J. Viosca”, #417 530 of the docket, of the Civil District Court for the Parish of Orleans, the succession of the decedent’s mother in which there was judgment on November 19, 1963 placing him in possession of an undivided one-half interest with his brother Jules in an estate having a stated net value of $143,137 (consisting mostly of homestead stock) after payment of inheritance taxes.
(6) Photostats of two receipts on printed forms of E. F. Hutton & Company, Inc. The first is a receipt by that company, dated September 22, 1964, showing it had received from Oswald Viosca the sum of $138,296.87 by N.B.C. check and had credited that amount to the decedent’s account. The other, dated September 21, 1964, is a receipt signed “O. W. Viosca” for the bonds in question. However, the receipt for the bonds shows that the same were delivered to “Mrs. Oswald W. Viosca”.
We base our consideration of the question here presented upon two rules of law so fundamental and well established as to require no citation: (1) the ultimate burden of proof by a reasonable preponderance of the evidence is upon the plaintiff in rule, a principal especially true in this case where possession of the unregistered bearer bonds, negotiable by delivery, is prima facie evidence of ownership; and (2) on questions of fact, especially those involving the credibility of witnesses, the trial court will be reversed only for manifest error. However, in this case there is more involved than the question of credibility of the witnesses.
The trial court judgment is based largely upon an application of the doctrine “Falsus in Uno Falsus in Omnibus” (He who speaks falsely on one point will speak falsely upon all). Because in his pre-trial deposition Jules Viosca admittedly lied about his knowledge and possession of the bonds, the trial judge apparently rejected all of his testimony and also rejected the testimony of Miss Fleckinger. The maxim is a harsh and unrealistic rule which should be applied only with extreme caution. 3 Wigmore, Evidence, §§ 1008, et seq. (3d ed. 1940); 98 C.J.S. Witnesses § 469; see State v. Banks, 40 La.Ann. 736, 5 So. 18.
Where a witness has testified falsely to some material fact or facts and there are no circumstances in the case tending to corroborate his evidence, his testimony may be rejected in toto; but such false testimony does not require that *517 his testimony be disregarded in its entirety; and the court should not reject those portions of such testimony as may be corroborated by other credible and uncontra-dicted evidence; to do so is to commit error. Morris v. Morris, La.App., 152 So.2d 291; Goynes v. St. Charles Dairy, La.App., 197 So. 819; Smith v. York, La.App., 152 So. 152.
In the instant case the testimony of Jules Viosca in large measure is supported by reliable, uncontradicted documentary evidence and other testimony, including not only the testimony of Miss Fleckinger and the two totally disinterested bank officials called by the defendant in rule, but also by some of the testimony of the witnesses for plaintiff in rule. For example, the testimony that the decedent never had possession of the bonds is supported by the testimony of Mitchell who stated that when he saw the decedent at Hutton’s on the date, and immediately following the completion, of their purchase, Oswald Viosca did not have the bonds in his possession; Mitchell’s testimony also supports the testimony of Jules Viosca in that Mitchell stated he did receive a commission and did save the purchaser some money on the purchase; and those portions of Kingston’s testimony in which he states that, several days prior to the completion of the purchase, Jules Viosca appeared at his office with a check for the purpose of picking up the bonds and that when the decedent called for the bonds he was accompanied by a lady (obviously Miss Fleckinger) support similar testimony given by both Jules Viosca and Miss Fleckinger.
Despite her denial of any knowledge of the bonds to the attorneys for the succession when questioned informally in the office of Jules Viosca, Miss Fleckinger appears to be a credible witness, especially in view of the documentary evidence supporting part of her testimony. At the trial and under oath she testified in a knowledgeable and straightforward manner. And we note that, particularly since she was no longer in Jules Viosca’s employ at the time of trial, her testimony is less selfserving than that of either the heirs or Jules Viosca. Her testimony supports that of Jules Viosca in every material detail. Indeed, other than the ultimate conclusion as to ownership of the bonds, the evidence offered by Jules Viosca is largely uncontradicted in any material respect by any evidence in the record.
We note the receipt for the bonds which was signed by the decedent shows the bonds were delivered to “Mrs. Oswald W. Viosca”. Since Mrs. Oswald W. Viosca died on June 29, 1962, more than two years before the purchase, the lady who received the bonds obviously could not have been the decedent’s wife. Though in error as to the name, the receipt does show the recipient was female; and from all the evidence, she was Miss Fleckinger.
We are firmly convinced, and none of the appellees contends otherwise, that the bonds were never in the possession of the decedent. They have been solely in the possession of Jules Viosca continuously since the date of their purchase from E. F. Hutton & Company, Inc., first through possession on his behalf by his employee, Miss Fleckinger, and thereafter by his personal possession thereof. We also note the decedent, a lawyer, represented Jules Viosca in all legal matters; but there is no evidence that Jules Viosca ever acted for the decedent in any capacity.
Financial ability to obtain the sum of $138,296.87 used to purchase the cashier’s check by which payment for the bonds was made is an important consideration. In this connection, beyond question, the record reveals that Jules Viosca not only had such financial ability, he actually obtained that amount in cash at the approximate time he would ordinarily be expected to do so in order to pay the purchase price on the date the sale was to take place. He converted his homestead stock and accounts into homestead checks totaling $140,000 on September *518 8, 9, and 16, 1964 and he cashed those checks prior to the purchase of the bonds on September 21, 1964.
On the other hand, the record is devoid of any evidence at all tending to show that the decedent obtained, in cash or otherwise, the $138,296.87 necessary to purchase the cashier’s check. It occurs to us that in this case if the decedent actually had completed a transaction of such size, some evidence of the same could and would have been found and offered by or on behalf of his heirs. Nor does the record contain any evidence showing or tending to show that the decedent had the financial ability to obtain the sum of $138,296.87. Indeed, such proof as appears in the record would tend to show the contrary.
As shown by his pleadings filed on December 1 and 2, 1960 in the separation suit instituted against him by his wife, the decedent was ill and unable to pay alimony at the rate of $500 a month at that time. His illness appears to have continued during the remainder of his life (Mrs. Brignac testified that during 1964 he told her he had only six months to live) and his financial situation does not appear to have improved at the time of his wife’s death on June 29, 1962. As shown by her succession proceedings, in which Oswald Viosca appeared personally and as attorney (he swore to the descriptive list as did Mrs. Brignac and Mrs. Gamble), the stated value of his wife’s estate, including her share of all community property, was $13,319.69. It is true that the gross total inventoried value of the property in this, Oswald Viosca’s succession is $208,004.32. But $46,302 of that gross total is the inventoried value of certain immovable property in St. Tammany Parish which the decedent acquired by deed from his mother in 1963; while there is $40,638.89 in various bank checking and savings accounts, the inventory reveals that on October 8, 1965, just two days before his death, the decedent made loans in the total amount of $29,500, apparently for the purpose of using the money to purchase municipal bonds in the amount of approximately $30,000, a transaction which was not completed because of his death (the contemplated purchase at that time was testified to by both Mrs. Gamble and Mitchell) and, also apparently, the $29,500 thus borrowed forms part of the $40,638.89 in bank; also included in the total is a large portion of the approximately $70,000 inherited by the decedent from his mother in 1963 for, as shown by a comparison of the property involved in the elder Mrs. Viosca’s succession and in this one, a large portion of the homestead stock thus inherited was retained by him; and we know the decedent obtained $20,000 in 1965 for his wife’s accidental death. In the light of all of this documentary evidence, the decedent’s apparent financial condition in 1960 and 1962, and his continuing serious illness to the time of his death, it is extremely unlikely he was able to pay $138,296.87 in cash for bonds in 1964 and still leave property having an inventoried value of $208,004.32.
One other consideration should be mentioned. Decedent’s last will, which was probated herein, is dated June 18, 1965, less than five months prior to his death on October 10,1965 and more than eight months after the bonds were purchased on September 21, 1964. The will bequeaths to Mrs. Brignac only her share as a forced heir. It bequeaths to Mrs. Gamble her share as a forced heir and, in addition, the immovable property located in St. Tammany Parish and the entire disposable portion of the estate, all as an extra portion. The bonds are not mentioned in the will; but the St. Tammany property, which had a value of less than one-half that of the bonds, is specifically mentioned. Although both Mrs. Brignac and Mrs. Gamble testified their father had told them he had purchased the bonds for their benefit, both of those ladies admitted he had never told them where the bonds were. If the decedent actually owned the bonds, it is highly improbable that he, an experienced, practicing attorney at law, would have failed to take some action, by manual gift, testamentary dis *519 position or otherwise, to make certain his daughters received the bonds. This is true even if, as suggested by Mrs. Gamble’s testimony, he planned to evade payment of inheritance, estate and gift taxes.
We conclude the plaintiff in rule quite clearly has failed to carry her burden of ultimate proof by a reasonable preponderance of the evidence.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered that there be judgment in favor of defendant in rule, Jules J. Viosca, and against plaintiff in rule, Lynn Viosca Brig-nac, dismissing the rule; costs of this appeal to be paid by plaintiff in rule appellee, Lynn Viosca Brignac.
Reversed.