377 So.2d 355 (1979)
Cleola BROWN, Plaintiff-Appellant,
v.
STATE MUTUAL LIFE INSURANCE COMPANY OF AMERICA, Defendant-Appellee.
No. 7157.
Court of Appeal of Louisiana, Third Circuit.
August 30, 1979.
On Rehearing November 12, 1979.
*356 Neblett, Weeks & Neblett, B. Gerald Weeks, Alexandria, for plaintiff-appellant.
Watson, Murchison, Crews, Arthur & Corkern, R. Raymond Arthur, Natchitoches, for defendant-appellee.
Before SWIFT, STOKER and DOUCET, JJ.
STOKER, Judge.
This is a suit to collect insurance benefits based on the alleged accidental death of the insured, Johnny R. Brown. His widow, Cleola Brown, is the plaintiff-appellant. The policy sued on is an accidental injury death policy.[1] The sole question presented by the case and this appeal is: Did the plaintiff prove that an accident caused her insured husband's death? The trial court held that plaintiff-appellant did not prove this essential fact. We reverse.
The decedent's death did not occur on the date of his alleged injury. There is no question of his death and that it resulted from infection of his left foot which developed into gangrene. Plaintiff-appellant claims the infection was caused by an accident in which her deceased husband stepped on a crate and stuck a staple in his foot. There was only one witness to the alleged incident. This was the son of plaintiff, Clinton Johnson. The defendant-appellee insurer denies the incident took place. It urges that Johnny R. Brown was a diabetic and that he suffered circulatory and foot infection problems through the years. The defense to the action urged by defendant, State Mutual Life Insurance Company of America ("State Mutual") is that plaintiff failed to prove that an accident occurred.
Alternatively, State Mutual contends that the death did not result directly and independently of any other cause.[2]
*357 The widow's claim rests entirely on the import and effect given to the testimony of her son. The trial court rejected the son's testimony. It found that plaintiff did not show that Brown's death was the result of an accident. The trial court remarked as follows:
The evidence offered by the plaintiff fails in its quality or weight to tip the scales; therefore the plaintiff's case must fall for lack of preponderance of evidence that an accident happened.
Undisputed Facts.
From a medical standpoint the deceased, Johnny R. Brown, suffered exceptionally from diabetes. For some time prior to the Summer of 1976 he continually consulted Dr. Raymond R. Utke of Leesville for his condition. Generally, it manifested itself in foot infection. Brown was employed as a Vernon Parish school bus driver; he was also employed by the Army and Air Force Exchange System at Ft. Polk, Louisiana. In the latter employment, Brown drove a truck for what was known as the Running Chef Concessionaire.
Brown consulted Dr. Utke on June 26, 1976, for an infection of the bottom of the left foot. On a return visit on July 2, 1976, the foot was much better and had apparently healed; however, on July 23, 1976, Brown returned and Dr. Utke was alarmed by the condition of the foot. By deposition Dr. Utke testified that on July 23, "he had one of the worse infections I've ever seen." His record shows no history of trauma. Dr. Utke was so concerned that he immediately referred Brown to Dr. William H. Heath of Alexandria and Brown was hospitalized. In taking a history from Brown, Mrs. Brown, the plaintiff, related that infection had begun some three weeks prior to that time when Brown stuck a staple in his foot.
Dr. Heath was unable to control the infection because of the diabetic problem and the infection went into Brown's lower leg. Ultimately, the left leg was amputated above the knee in an effort to avoid the progress of gangrene. This occurred August 4, 1976. Nevertheless, Brown died on September 6, 1976.
Dr. Utke's testimony was that Brown never gave him any history of trauma as the cause of the infection. On the other hand, he could only say his record did not show any notation of trauma. He admitted that Brown was a "poor historian" in giving facts. Dr. Heath testified that the incident concerning the stepping on the staple and injury to Brown's foot was emphatically mentioned to him by Mrs. Brown in Brown's presence when he took his history. Dr. Heath observed a collar button type abscess between the great and second toe which went all the way through from top to bottom. What he found was medically consistent with a nail puncture wound of the left foot. The medical testimony appears to establish that in patients suffering from severe cases of diabetes, trauma is not necessary to cause infection. In any event, exceptional trauma is not necessary as infection may result from a slight scratch or from the cutting of one's toe nails.
Disputed Facts.
Plaintiff alleged in her petition that her deceased husband sustained an accidental puncture of his left foot on June 26, 1976, which caused infection which progressed toward gangrene and eventually caused his death. Defendants urge this was impossible, because on that date he saw Dr. Utke, and the condition of his foot was such that it could not have resulted from trauma that day. Moreover, the fact that Dr. Utke recorded no trauma in connection with his history shows according to defendants, that the infection of June 26, 1976, did not result from a nail or staple puncturing the deceased's foot that day.
As stated above, Clinton Johnson, was the sole witness to the foot puncturing incident. Johnson is plaintiff's son and was the step-son of the deceased. He testified that on the date of the incident he assisted Johnny R. Brown and helped clean out his Running Chef truck at North Ft. Polk. Johnson stated Brown stepped from the truck and his left foot landed on a dilapidated crate. In the process, Brown stuck a metal object, a long thin staple used in holding the wooden *358 crate together, in his left foot between the great toe and second toe.
After the evidence was taken, plaintiff took the position that her allegation that the incident and injury occurred on June 26, 1976, was not binding, because that allegation had stated the event occurred "on or about June 26, 1976". Plaintiff-appellant then took the position that the incident happened after July 2, 1976, subsequent to the time of the second visit to Dr. Utke when the condition complained of on June 26, 1976, had cleared up.
Trial Court's Holding.
This case was tried on July 18, 1978, approximately two years after the time of the alleged accident. The trial court found Clinton Johnson's testimony unworthy of belief. The trial court also pointed out that plaintiff-appellee, Cleola Brown, filed a statement of claim in which she stated her husband's injury happened three weeks before his death. In written reasons for judgment the trial court set forth the following reasons for its holding:
The Court notes these things that are in evidence. Dr. Rodney R. Utke was the family physician who treated decedent over a period of several years for a problem associated with diabetes including a hospitalization in June of 1975 with an infected left foot. On the date alleged that this accident occurred, June 26, 1976 Dr. Utke treated Brown for an infected bottom left foot. Dr. Utke again saw decedent on July 2, 1976 when it appeared that the infection had improved but when he examined decedent on July 23, 1976 the infection had worsened. Dr. Utke obtained no medical history of trauma on these occasions. The decedent was referred by Dr. Utke to [Dr. William H. Heath in Alexandria.] The history relating to the nail being stepped on was given to Dr. Heath by decedent's wife. The only witness to the alleged accident was the step-son of Johnny Ray Brown who is named Clinton Charles Johnson. Clinton Charles Johnson related the events of the day which included the operation of a school bus on that date and the cleaning of decedent's truck at Fort Polk on the date of the accident. Clinton Charles Johnson was not sure of the date of the accident, not even the year. He did say that it was in the summer time and that he thought it was in June. Finley Stephen Stanley, Supervisor of the Vernon Parish School Bus Routes, stated that school was out on May 28, 1976, further that there were no school buses running to public schools on June 26, 1976. He further stated that there was no inspection of school buses for Vernon Parish schools in June.
Concerning the Fort Polk Exchange and the Post Exchange and Johnny R. Brown's relationship to "Running Chef", there was a rule that every minor accident had to be reported and that Johnny R. Brown reported no accident during the period under consideration. The Court notes a great disparity between the date of June 26, 1976 and 3 weeks before death on September 6, 1976. If the accident occurred 3 weeks before death then the accident occurred in August and not June nor July.
If in fact Johnny R. Brown went to see Dr. Utke on June 26, 1976 he did not do all of the things that his step-son testified he did. If in fact the Vernon Parish public school buses were not running on June 26, 1976 then the testimony of Clinton Charles Johnson concerning school bus operation on the date of the accident is incorrect. If the accident which is alleged in the petition to have occurred on June 26, 1976 did not happen on that date[,] then when did the accident happen? Clinton Charles Johnson failed to even be able to tell us the year. The evidence offered by the plaintiff fails in its quality or weight to tip the scales; therefore the plaintiff's case must fall for a lack of preponderance of evidence that an accident happened.
Determination of Manifest Error.
In opposition to the trial court's holding, the plaintiff-appellee urges that the trial court has been unjustifiably harsh in judging *359 the testimony of the single eyewitness concerning dates of occurrences two years after they happened. Counsel complains on behalf of plaintiff that Clinton Johnson is not a person of sophistication who may be expected to recall precisely when and how events occurred two years previous.
Plaintiff-appellee's specifications of error are as follows:

SPECIFICATIONS OF ERROR
The judgment of the district court in this matter is erroneous and contrary to law for the following reasons:

1.
The holding of the district court that the plaintiff did not meet the burden of proof is erroneous because the trial judge misunderstood and misconstrued the facts in evidence and testimony of the only eyewitness.

2.
The holding of the district court that the plaintiff did not meet the burden of proof is contrary to law because there was no conflicting or contradictory evidence presented to impeach or discredit three of the four witnesses for the plaintiff and their testimony should stand as positive proof.
In performing our task of determining whether or not the trial court committed manifest error in its factual finding in this case, we are mindful that we must conclude that the findings, based on testimony the trial court heard, were "clearly wrong." Arceneaux v. Domingue, 365 So.2d 1330 (La.1979) and Canter v. Koehring Co., 283 So.2d 716 (La.1973). The deposition testimony of the physicians, Dr. Utke and Dr. Heath, is not in dispute and not contradictory. Our task is all the more difficult because the trial court has rejected the testimony of Clinton Johnson although there is no direct contradiction of his testimony on the point at issuethe happening or non-happening of an accident which injured Johnny R. Brown causing him to develop infection which led to his death. There is much merit to the arguments made on behalf of plaintiff-appellee to the effect that the trial court did not give due latitude to Johnson's imprecise recollection and inability to be certain, and that the trial court misunderstood and misconstrued some of his testimony.
After having seriously reflected on the record and having given due consideration to the reasons assigned by the able and distinguished trial judge, we have concluded that he was clearly wrong in his judgment. His rejection of the testimony of Clinton Johnson is based solely on his conclusion that Johnson could not be believed because his veracity had been impeached. While we do not have the benefit of observing the witness's demeanor and manner of testifying, we find that the record fails to support a conclusion that Clinton Johnson was impeached. We note that contradictions in Johnson's testimony do stand out in the record. Understandably the defense has made much of the fact that the petition alleges that the accident and injury occurred on June 26, 1976, and of the many discrepancies and absurdities which result from holding plaintiff-appellee to that date. However, the date was alleged as "on or about June 26, 1976".
1. Date of Accident.
At the trial the plaintiff took the position that the foot puncturing incident took place after the second visit to Dr. Utke, that is, after July 2, 1976. Under such circumstances, the statement of Mrs. Brown made to Dr. Heath on July 23, 1976, that the injury occurred approximately three weeks previous, would not be inconsistent with a date after July 2, 1976. After all, the medical testimony of Dr. Utke was that on July 2, 1976, the foot was practically healed. Dr. Utke makes it clear that on July 23, 1976, he made no careful examination of the foot of the deceased. After taking one look at the foot on July 23, 1976, he immediately called Dr. Heath in Alexandria and had Brown report that very day for hospitalization and care by Dr. Heath.
*360 Dr. Utke concedes that an injury after July 2 could have caused the infection he saw on July 23. Nevertheless, he expressed the opinion that it "was the same progressing infection" he had seen earlier which had gotten worse. (Tr. 57) His testimony as recorded on pages 52 and 53 of the transcript is as follows:
Q. Do you recall asking Mr. Brown exactly what caused the infection on his foot?
A. I probably didI just didn't make a notation of itand I think I probably asked him you know why he didn't come in beforeI didn't even get theI had the impression it was just several days that this thing had really gotten bad and you know that he had done fairly well for a few days after I had seen him and then it suddenly started flaring up and getting the infection again.
Q. But if Mr. Brown told you that he did step on some sort of thing with his foot that wouldn't be inconsistent with what you saw.
A. It wouldn't be, no, sir. But as I said I feel that I might have made a notationit's not impossible that I might have missed doing thatbut I just don't recollect that at this time.
Q. I mean we understand that, but I mean that's allI'm just trying to get (Interrupted)
A. Yes, sir, I understand that
Q. but he could havewhat you saw medically is not inconsistent with[,] you know[,] perhaps a nail puncture wound to the bottom of the foot that could have progressed into the infection
A. could have introduced an infection that indeed was very bad
Q. And it's just simple [simply] that your notes do not reflect the history or fact that trauma was related
A. That's right
On the other hand, despite Dr. Utke's insistence throughout his deposition that his notes contained no reference to traumatic causation of the infection, there appears in his office notes for July 23, 1976, the following clear notation: "He never mentioned injury on the job. To my knowledge he did not have any injury during 1976. All was old problem." (Tr. 63)
Mrs. Brown testified (Tr. 147-148) that the injury took place after her husband's second visit to Dr. Utke, i. e., after July 2, 1976. She was not at the scene of the accident, but she describes seeing the injured foot when her husband returned home from work. She remonstrated with him for failing to go on sick call in view of his known diabetic condition. (Tr. 150) The trial court properly sustained objections to hearsay testimony by Mrs. Brown (Tr. 151) that the deceased made three trips to Dr. Utke before he was able to get into see him. However, she testified that she was with him when he did get to see Dr. Utke (Tr. 152). This would have been the July 23, 1976, visit because she testified that was the occasion on which Dr. Utke referred Brown to Dr. Heath. (Tr. 153)
The trial court appeared to be impressed with the damaging effect of the statement of claim signed and filed by plaintiff-appellee (Exhibit D-3 at Tr. 88). Typed on the form are the words "three weeks before death" in a blank in which is printed the words "WHEN INJURY HAPPENED (Date and Type)". Mrs. Brown was cross examined concerning this. (Tr. 160-162) The statement is typed and is a "fill in the blanks" type form and not a narrative. She did not recall signing it but did state she notified the bank which sponsored the New Outlook Club group policy. It is quite evident that some employee of the bank took the information, typed in the blanks and had Mrs. Brown sign it. We think it also is evident that whoever took the information misunderstood the information given by Mrs. Brown. It would be incredible for Mrs. Brown to state that the injury took place three weeks before her husband's death which occurred on September 6. Brown entered the hospital on July 23, 1976, and on that date Mrs. Brown told Dr. Heath the injury had occurred three weeks *361 before that date. He was in the hospital continuously from July 23 until September 6, 1976. Under the circumstances, we are convinced that whoever typed the statement misunderstood Mrs. Brown, and Mrs. Brown signed the statement without reading it critically. With due respect for the opinion of our brother below in this regard, we respectfully place no significance on the signing of the statement of claim, D-3, containing the manifestly erroneous statement as to the date of Brown's injury.
The trial court observed in its reasons for judgment that Clinton Johnson "was not sure of the date of the accident, not even the year." Our own impression of Johnson's state of mind differs in this respect. While it is clear that he was not certain as to the date, we do not believe that uncertainty should be held against him in giving testimony. In fact there is no particular reason why he should necessarily remember the exact day, if he ever had reason to note it. As to the year, there is no doubt in our minds that Johnson was certain the injury took place in either June or July of 1976. Repeatedly in his deposition and trial testimony, Johnson insisted that he could not remember the exact day. Unfortunately, instead of sticking to that position during cross-examination, he would allow himself to be cornered into adopting June 26, 1976, as the date of the occurrence and then later into admitting he could not fix the date at all. The record is replete with dialogue between defense counsel and Johnson over this point. We think that a complete reading of the record reveals that Clinton Johnson had no fixed idea as to the date of the affair in question, but that he knew that shortly thereafter his step-father developed a bad infection and as a result died within two months or less. However, he was no match for experienced counsel.[3]
The substance of Clinton Johnson's trial testimony is followed in the same vein as the deposition testimony. It seems clear that in Johnson's own mind he was certain the occurrence was in 1976 and in either June or July. We are not impressed by the ability of counsel to shake him and cause him to express indecision. We are more impressed by the fact that he related the occurrence to the death of Johnny R. Brown which is an established date, September 6, 1976. In that connection, he testified the foot injury occurred "maybe a couple of months, or maybe a month and a half before then." (Tr. 190) There is no question that Clinton Johnson was made to appear in a bad light in his testimony as to the exact *362 date of the accident. He waivered from being sure the accident happened in June, to saying it was June or July and finally to not being sure at all. Ultimately, he admitted as much as is recorded on page 196 of the transcript as follows:
Q. Isn't it a fact, though, Mr. Johnson, your recollection of this whole thing is very, very hazy, isn't it?
A. Notno sir, not as far as him sticking that nail in his feet. [sic] The dates and all that is kind of hazy to me because I didn't have no paperI wasn't taking none of this down and I didn't think nothing of him sticking the nail in his feet, [sic] `cause that could have happened to me or anybody else. I do know for a fact that I pulled the board with the staple out of his feet. [sic]
We are of the opinion that Clinton Johnson's uncertainty in this regard was more apparent than real. He was testifying two years after the event. It is much more important that he placed the accident within six weeks to two months of Johnny R. Brown's death than that he remember a specified day or a given month. After all, at the time it happened it was of no great consequence. No doubt no one at that time dreamed that the puncture wound would eventually lead to Brown's demise from gangrene.
2. Impeachment testimony.
As has been noted, the trial court rejected plaintiff's demands on the specific ground that she had failed to show by a preponderance of evidence that an accident happened. Inasmuch as there is no contradictory evidence on the occurrence of the accident, it is clear that the trial court simply rejected Clinton Johnson's testimony on the ground that he had been impeached to such an extent that his testimony should be rejected in its entirety. Perhaps it also considered plaintiff's testimony was impeached because of the statement on the statement of claim form.
Defendant's brief sets forth thirteen points which it urges show numerous false and inconsistent statements which indicate complete lack of proof of an accident. In essence several of the points indicated merge and overlap and could be consolidated. To begin with we note that defendant places over reliance on plaintiff's petition allegation that the accident which injured Johnny R. Brown's foot happened on June 26, 1976. The tenor of defendant's argument, and indeed counsel's cross examination, is that plaintiff has thereby implacably nailed her case to that date. We have already noted that the accident occurred "on or about" June 26, 1976. Therefore, we do not regard this language of the petition as compromising or impeaching the testimony of Johnson or Mrs. Brown.
There is no question but that Clinton Johnson made a poor witness in his responses to cross examination in his discovery deposition and trial testimony. He gave testimony in his deposition which he repudiated at the trial. He gave conflicting testimony in the trial itself. None of this testimony related to the facts surrounding the accident. Most of such testimony had to do with what Johnson did later in the afternoon of the day of the accident. The conflicting testimony was given in response to defense counsel's extensive probing. It is possible in reading the testimony to regard much of the testimony and the explanations given by Johnson as being plausible. On the whole, however, and after very carefully studying the testimony, we are of the opinion that on matters not directly relating to the facts surrounding the accident, Clinton Johnson's veracity was cast in serious doubt.
In plaintiff's brief counsel had made eloquent argument to justify Johnson's testimony on the ground that he was an uneducated, unsophisticated person who did not intend to deliberately mislead counsel or the court or to give false testimony. Johnson attempted to justify discrepancies between his trial testimony and his deposition testimony on the ground that he was unaware of what he would be questioned about at the time of the deposition, but by the time of trial had had opportunity to reflect and *363 realize that some statements given in the deposition were in error. As a matter of fact, the trial judge did not discuss the discrepancies in terms of credibility but only in terms of whether plaintiff successfully carried the burden of proof. Despite his failure to mention credibility, we assume that he actually applied the rule of falsus in uno, falsus in omnibus. Under this rule it is within the discretion of the trial judge to reject the testimony of a lying witness in its entirety if the circumstances of the case indicate a false statement was made on relevant or pertinent matters. Ferrantelli v. Wright, 346 So.2d 242 (La.App. 4th Cir. 1977); Mackbee v. Ford Motor Company, 327 So.2d 654 (La. App. 4th Cir. 1976), application denied 332 So.2d 279 (La.1976); Stewart v. Allstate Insurance Company, 285 So.2d 556 (La.App. 1st Cir. 1973); Swann v. Holley, 263 So.2d 478 (La.App. 1st Cir. 1972); Scott v. Daigle, 210 So.2d 174 (La.App. 4th Cir. 1968); Succession of Viosca, 202 So.2d 511 (La.App. 4th Cir. 1967) and numerous others.
Nevertheless, as several of the cited cases set forth, the giving of false testimony does not require that the testimony of the witness be disregarded in its entirety. The court should not reject those portions of such testimony as may be corroborated by other credible and uncontradicted testimony. Moreover, it is also established that the maxim falsus in uno, falsus in omnibus is a harsh and unrealistic rule which should be applied only with extreme caution. Succession of Viosca, supra; Stewart v. Allstate Insurance Company, supra; Swann v. Halley, supra; Scott v. Daigle, supra; and Succession of Viosca, supra. The last case cites 3 Wigmore, Section 1008 et seq (3rd Ed 1940) and 98 C.J.S. Witnesses § 469 to which may be added 81 Am.Jur.2d, Witnesses, Section 669.
The question posed by the requirement (that the rule above discussed be sparingly applied) becomes whether the trial judge abused his discretion in applying the rule. Despite our reluctance to reverse the distinguished and fair minded trial judge in this case, it is our judgment that the rule should not have been applied in this instance. Mrs. Brown saw her husband's foot wound on the day that he sustained the injury. Although Dr. Utke discounts the possibility that injury caused the infection and condition of the deceased's foot which he observed on July 23, 1976, he admitted the possibility of traumatic causation. Also, we do not believe he was at all concerned with causation at that time but was vitally concerned over Johnny R. Brown's safety and getting him immediate hospitalization and specialized care. Medically, at that point, causation appeared to be immaterial. Further, Dr. Heath testified that when he saw Brown on July 23, 1976, there was a collar button type wound between the great toe and second toe. With such corroboration, we believe the extreme caution which the rule requires before it is applied, and the general policy of the law against its application, require that it not be applied.
For the foregoing reasons we believe that the occurrence of the accident causing injury within the terms of defendant's policy was adequately proved.
Did Death Result Directly and Independently of any Other Cause?
As an alternative defense defendant-appellee urges that the death of plaintiff's husband did not result directly and independently of any other cause. Defendant-appellee urges that the death was caused by severe and uncontrolled virulent diabetes. In that event defendant urges that no benefits are owing because of a policy exclusion. The exclusitory provision excludes benefits for death caused by disease, natural causes, or medical or surgical treatment. We accept the rule on this question to be that if the traumatic event is the predominant cause of the loss (death in this case) the exclusion does not apply. Even if an injury aggravates an existing illness or disease, accelerating death, the death is regarded as resulting directly and independently of all other causes. Murphy *364 v. Continental Casualty Company,[4] 269 So.2d 507 (La.App. 1st Cir. 1972) and Lipscomb v. Equitable Life Assurance Society of U. S., 205 La. 758, 18 So.2d 167 (1944).
Penalties and Attorney's Fees.
Plaintiff-appellee's claim for interest as penalties and for attorney's fees under LSA-R.S. 22:657, based upon the alleged arbitrary failure to pay benefits upon the submission of notice and proof of claim, is denied. This case presents ample reasons for defendant-appellee to have declined to make payment.
Decree.
It is ordered, adjudged and decreed that the judgment of the trial court rejecting plaintiff-appellant's demands be reversed and set aside. Judgment is hereby rendered in favor of plaintiff, Cleola Brown, and against defendant, State Mutual Life Insurance Company of America, in the full sum of $5,000.00, together with interest thereon from date of judicial demand, until paid. Defendant is cast for all costs in this proceeding including the costs of the appeal.
REVERSED AND RENDERED.

ON REHEARING
A rehearing was granted upon plaintiff's application for the purpose of reconsidering our award on the original rehearing. Our award under the policy of State Mutual Life Insurance Company of America was fixed at $5,000. The smallest amount of benefit provided for death under the policy is $10,000. The policy provides for a maximum benefit for two classes of membership, Class I and Class II. The maximum for Class I is $10,000 and $15,000 for Class II. We have not found anything in the record indicating the class to which the New Outlook Club of which Johnny R. Brown belonged. However, plaintiff as applicant has suggested in her application for rehearing that it is $10,000. As this is the lower of the two benefits, plaintiff as beneficiary is entitled to at least that amount. Therefore, our judgment and decree rendered on original hearing should be amended to substitute the figure $10,000 as the award in place of $5,000. Otherwise, the original judgment, as thus amended, is affirmed.
ORIGINAL DECREE AMENDED, AND AS AMENDED AFFIRMED.
NOTES
[1] The policy in question was a group policy issued to members of the New Outlook Club through a banking institution. Benefits (in this case a death benefit) are payable under the following terms: "If injury to an Insured Person results, directly and independently of any other cause and within one year from the date of the accident in any of the losses set forth [as shown in the policy schedule], the Company will pay the sum specified ..."
[2] Defendant-appellee, State Mutual, contends that no benefits are due because of an exclusion in defendant's policy for death caused by disease, natural causes, or medical or surgical treatment, and that the death of Johnny R. Brown was caused by severe, uncontrolled virulent diabetes.
[3] We could detail the testimony but will confine ourselves to quotation of some of it to illustrate. The opening essay by counsel on this point began in the discovery deposition taken June 8, 1978. Beginning on page 7 of the deposition (Tr. 95), the examination is recorded as follows:

Q. Well what date was it that he was supposed to have stepped on the staple?
A. I don't remember the date exactly either, but I was with him because I pulled it out of his feet [sic], and I teased him about it for a couple of days.
The following appears on page 9 of the deposition (Tr. 97):
Q. Now I'm not following youlet me rephrase my questionOn this particular day, which you say you don't remember when this happened
A. I don't remember the exact date
Q. Could it have been in 1975?
A. NoI remember it was in Junebut I don't remember the exact dateI don't remember the exact date.
This matter was again pursued on page 11 of the deposition (Tr. 99):
Q. Are you sure it was in 1976?
A. Yeah, '76I ain't sure about that either but I know what happenedI was with him when it happened.
Q. You are not even sure it was in the year 1976?
A. I'm pretty sure it was around '76. Because see the employees that's out thereI know good and well they remember me coming out there
Q. Let me ask you thisif I told you that Mr. Brown was hospitalized on June 16, 1975, at Broyles Clinicwould that have been the date?
A. Well I don't remember exact dates and years, nothing like that, but I remember him going to Broyles Clinic because that's the first hospital he went to before they took him over here to CabiniI believe CabriniI'm not sure about dates.
Q. I understand, so it could be 1975 so far as you know?
A. I don't remember nothing about dates the only thing I can remember about is the month and that's when I did that to my car.
[4] In the Murphy case the following conclusion was reached: "In other words, if death would not have occurred when it did but for the injury resulting from the accident, it was the direct, independent and exclusive cause of death at that time, even though death was hastened by the diseased condition."